# Court of Appeals.

April 14, 1896.

## PEOPLE v. TEUFIL TUCZKEWITZ.

1. EVIDENCE—HOMICIDE—INSANITY.

Where, on the trial of an indictment for homicide the defense is insanity, the hypothetical question to an expert witness, which assumes that the de. fendant was subject to epilepsy, when there is no evidence to such effect, is properly excluded.

2. SAME—ERROR CURED.

But, if such ruling is objectionable, it is cured by a subsequent ruling permitting the question in substantially the same form to be answered.

3. SAME—HYPOTHETICAL QUESTION.

Upon such trial, an 'answer to a hypothetical question which embraces a conclusion of law which was not called for by the question or proper to be included if it had been, is properly excluded.

4. HOMICIDE—INSTRUCTION.

A request to charge "that the jury were bound to believe the testimony of any disinterested witness which is not contradicted and which is not in itself improbable," is properly declined.

5. SAME—QUESTION OF FACT.

The rules of evidence in civil cases are applicable also to criminal cases, except that in criminal cases the jurors are the exclusive judges of all questions of fact.

6. SAME—INSTRUCTION.

Upon such trial, an instruction "that if the jury find that, at the moment of shooting, the defendant had sufficient reason to know the nature and quality of his act, and that it was wrong; but that, nevertheless, he would not have done it but for a sudden fit of passion, they can not convict him of the crime charged in the indictment," is properly refused.

7. SAME.

Refusal to charge " that if the jury believed that the defendant's mother, in her lifetime, was insane, and that insanity is hereditary, they must take that fact into consideration in determining the question of the defendant's insanity at the moment of the shooting," is erroneous.

8. SAME.

The court is not required to charge in reference to specific items of evidence selected by counsel, but can only properly be called upon to charge generally with reference to the facts proved.

Appeal from a judgment convicting defendant of murder in the first degree.

Henry D. Sedgwick, Jr., and Herman L. Roth, for appellant.

John D. Lindsay, Asst. Dist. Atty., for the People.

HAIGHT, J.—On the 8th day of January, 1895, a little after five o'clock in the afternoon, at the office of one Adolph Lissner, at No. 228 East Sixth street; in the city of New York, the defendant, Tuefil Tuczkewitz, shot and killed one Adolph Balensiefer. The defense interposed upon the trial was that of insanity. There is some little variance in the testimony of the witnesses as to the minor details, to which attention will be called, but the controlliag facts are without material dispute.

The history of the case is substantially as follows :

The defendant was born in Russian Poland, in the year 1858. His father had engaged in the revolt in Poland, and had been banished to Siberia. After some years of banishment, he escaped, and fled to France, where he was last heard from. His mother was engaged as a domestic in an hotel, taking care of rooms. The defendant, when a young man, learned the trade of a weaver, and engaged in that business until he was about twenty-five years of age, when he came to the United States. He worked at his trade for a few weeks near Philadelphia, and then,

hearing that his mother was sick, returned to Russia. He remained with her, however, but a short time, when he again returned to this country, and worked at various occupations, as dish washer, as fireman, and assistant cook in a restaurant, and as a coppersmith. His chief employment was with George Kupferjan, who had a restaurant at No. 2046 Third avenue, in the city of New York, for whom he worked as a cook off and on for seven years. In June or July, 1894, he heard that his mother had died; and he again returned to Russia, where he received, as his inheritance from her estate, the sum of $800. He remained in Russia but a few days, and again returned to the city of New York, arriving about the middle of September. He deposited his money in a bank, and then sought a business in which he could engage. On the 1st day of October, he saw an advertisement in one of the papers of Adolph Lissner, a real estate broker, announcing an interest in a restaurant and bakery for sale. On the same day, he called upon Lissner at his office, at No. 228 East Sixth street, and was by him advised that the restaurant and bakery advertised for sale was that of Adolph Balensiefer, at 485 Third avenue. The defendant then went to Balensiefer, looked over the place, and entered into an arrangement with him to give him $700 for a half interest in the business, with the understanding that they would become copartners and that he should be permitted to draw from the business twenty-five dollars per week. That evening they returned to Lissner's office, stated the arrangement to him, and directed him to draw up the necessary papers, which he did, and on the next day they were executed, and the transaction closed. The defendant then went to work at the new place in which he had purchased an interest; but within a few days he again called upon Lissner, and complained that Balensiefer was not treating him fairly; that he had been informed that Balensiefer was a rascal; that he kept his daughters in the office, and they took in all the money. Lissner then went with him to the bakery, saw Balensiefer, and apparently adjusted the differences between them. But this lasted but for a few days, for about the 9th of October the defendant again called upon Lissner, and told him that he did not like the business, and wanted to get out of it. This resulted

in another interview with Balensiefer, in which he was asked to buy back the defendant's interest, but this he declined to ; but it was finally arranged that he should give the defendant $100, the partnership should be dissolved, and that Lissner should again advertise the business for sale, with the understanding that the defendant should have half the proceeds of any sale which should be effected.   Lissner then again advertised the business for sale, but no purchaser came until the 15th day of November, when a man by the name of Richard Reinhold was found, who entered into an agreement with Balensiefer to pay him $500 in cash, and engage in the business at once, with the privilege of deciding at the end of a week whether he desired to become a partner or the sole proprietor, by paying an additional sum of $900.   It was also agreed that, in case the business did not prove to be what it was represented, Balensiefer should return to him the $500 paid. At the end of the week, Reinhold entered into a co-partnership with Balensiefer, but did not pay him anything in addition to the $500.   Lissner advised the defendant that he was entitled to one-half of the $500 paid in by Reinhold.   The defendant then called upon Balensiefer for the money, who told him that he did not think he was entitled to anything until the entire business was sold, but that, to end the matter, he would give him $200 in cash for his claim.   This the defendant refused to accept, and an action was brought therefor in the district courts.   A judgment was obtained for the sum of $250, and execution was issued thereon against Balensiefer.   The execution, however, was returned unsatisfied by the city marshal, who reported that Balensiefer had transferred his interest in the concern to his wife.   Various plans were then talked over between the parties with reference to the sale of the business and a settlement of their difficulties, but nothing definite appears to have been accomplished, and it seems that the defendant had reached the conclusion that neither Balensiefer nor Lissner intended to effect any settlement with him.   At the time of the homicide, Balensiefer and the defendant had met Lissner at his office, for the purpose of arranging a settlement. Lissner was seated at his desk in a corner of the room, Balensiefer in a rocking chair on the same side of the room, but a few feet therefrom, and the defendant in a chair back of Lissner, but fac-

ing Balensiefer. Lissner testified : That the defendant then said :
" Well, Balensiefer, are you ready to make the arrangement we
spoke about yesterday ? " That Balensiefer answered : " That is
what I am here for. Are you ready ? " And the defendant said :
" Yes, but I want to light my cigarette first." At that the de-
fendant arose, walked into the next room, where the matches were,
and shortly thereafter he heard a shot. Turning to the right, he
saw the defendant with a smoking pistol in front of Balensiefer,
pointing against his body. The next instant Balensiefer jumped
up, and both came back of Lissner's chair, and, as he got up, he
heard a second shot. As soon as he turned around, the defendant
pointed the pistol at him, and he grasped it in his hand, and with
the other hand seized him by the throat. They struggled out into
the hall, and thence along the hall, until they reached the end by
the janitor's room. Then Lissner succeeded in wrenching the
pistol from the defendant's hand, and threw it back into the
kitchen. The janitress then came to his assistance, and they
pulled him along towards the stoop, and held him until Officer
Kennell came, and took him back into the office. The officer
pointed to Balensiefer, who was then dead, and asked the defend-
ant if he shot that man, and he said : " Yes, and I am sorry I
didn't shoot the other one," pointing towards Lessner.

The defendant's version of the affair is to the effect that they
were talking for a while, while sitting in their chairs, and that then
he said, "I want to smoke a cigarette." " I went into the adjoin-
ing room, and got a match and lit a cigarette. Then I took out
my pistol. I kept the revolver in my hand, on my way back,
so that the other one should not see it. * * * Then I went
to Balenseifer, and stood before him in this position [illustrating] ;
and I told him, ' Well, now we want to settle everything ;' and I
asked him if he wanted to give me two hundred dollars, and he
said, ' No ;' and I told him again to give me the one hundred at
least, and I will be satisfied with this one hundred, and every-
thing will be settled, and he said he will not give one cent. I
got excited. I took the pistol and shot him. He got hold of
my shoulders with both hands. I took my hand, put it in his
face, and pushed him back towards the chair upon which Lissner
was sitting. He was lying there, and I was lying [indicating]

with the abdomen on the chairs, and I had my hand in his face, and he bit my finger [indicating the index finger of the right hand]. When he done this, I got into a rage, and shot him again. Then Lissner came while I was still lying on the chair, and took the revolver away from me."

Other police officers arrived shortly after Officer Kennell, and Officer Hughes took the defendant to the station house. On the way he asked the defendant why he had killed Balensiefer, and he said they had skinned him out of seven hundred dollars. Hughes said to him, "Don't you know you have committed an awful crime?" and the defendant replied, "Well, I don't care." Hughes said, "Don't you know that it is a terrible thing to do that? You are liable to be punished." The defendant answered that he did not care, that he was going to shoot himself, and would have shot the other fellow too. Hughes asked him whom he meant, and the defendant said: "The notary public. He helped him to skin me. They were both in the deal." Hughes inquired what the deal was about, and the defendant answered: "You will see when we get to the station. I have letters in my pocket which I wrote." At the station house the defendant again repeated his avowal of the deed, and expressed his regret at not having killed Lissner also. Upon being searched, there were found in his pockets a box of 32-caliber cartridges, a business card of Balensiefer & Co., No. 485 Third avenue, a passport, citizenship papers, the original partnership articles between himself and Balensiefer, thirty-six cents in money, and two letters written by himself, one dated January 2, and the other January 8, 1895. The first letter was addressed to the authorities of the city of New York. In it he said that "Balensiefer and Lissner were under the same cover, and that he had made up his mind that blood should be atoned for in blood, and that he intended to kill them both." The last letter was addressed to William Netterman, 202 East Sixth street, with whom he lodged. It is as follows: "Having decided to die, I want to beg of you to go to court after January 11th, and take out the promissory note against Balensiefer; and, if you can get a few hundred dollars more out of it," he would like to have his body cremated, and that all he had belonged to Netterman. When the pistol

was shown him, he identified it as the one with which he did the shooting, and stated that, after the writing of the letter of January 2d, they put another advertisement in the papers, and that he dropped his intention to shoot them, and only wanted to shoot himself, and that, on the day of the homicide, it was his intention to shoot himself, in order that Lissner and Balensiefer should be exposed, and should be put into the penitentiary.

Taking the defendant's own version of the affair, we think it fully sustains the verdict of the jury. Balensiefer had obtained from him $700, and had returned but $100. The defendant had thus been deprived of the greater portion of his fortune, and he evidently believed that Balensiefer and Lissner, acting together, had cheated him out of his money. Whether this belief was well founded is quite immaterial. Believing it, furnished the motive under which he acted. That he deliberated and premeditated upon committing the homicide clearly appears by the letter written by him on the 2d of January, and that the design then formed continued until the act was consummated is apparent from the manner in which he equipped himself on the day of the shooting, with a revolver, his going into an adjoining room, taking it from his pocket, hiding it at his back, then returning to Balensiefer, demanding the money, and shooting on his refusal to deliver it. All of the statutory elements constituting the crime charged are here disclosed and established by the defendant's own testimony. Was he responsible?

Section 21 of the Penal Code provides that "a person is not excused from criminal liability as an idiot, imbecile, lunatic or insane person, except upon proof that at the time of the committing of the alleged criminal act he was laboring under such a defect of reason as either (1) not to know the nature and quality of the act he was doing; or (2) not to know that the act was wrong." Upon this branch of the case, evidence was given tending to show that, when the defendant was a boy, some one threw a stone which hit him on the forehead, leaving a scar; that, when he was about fourteen, he had an abcess on his hip; that at one time he fell down a flight of steps, and struck on his head; that at another he was skating on the ice, and fell, striking the back of his head, causing pains in it. When he was seventeen he

broke his arm, and, after he came to this country, had a toe ampu-
tated; that he indulged in self-abuse, and after he became twenty-
two had the gonorrhoea, and subsequently syphilis, from which
he had recovered. He was a great smoker of cigarettes, hot tem-
pered, and quarrelsome. On one occasion, when cooking for
Kupferjan, he drank a bottle of beer, and shortly thereafter
everything became dark before his eyes, and he suddenly became
unconscious, fell over, became rigid, and did not come to for
several minutes. When his mother was sick, she would break
out suddenly, and cry and laugh, often changing from one to the
other; would scold him, and then be good; and was filthy in
the bed in which she was sick. Several physicians were sworn
as experts, in which we find conflicting views as to his mental
condition. The defendant testified that he knew that the punish-
ment for murder in the first degree was death, and that he knew
it was wrong to kill.

A careful study of the case leads us to the conclusion that the
verdict of the jury is amply supported by the evidence. Indeed,
his sanity would seem to be demonstrated by his own testimony,
and by his actions and declarations at the time of the homicide.
Immediately after his arrest, he was taken into the room where
the homicide took place, and confronted by the dead body of
Balensiefer. He then stated that he did the shooting, and within
a few minutes thereafter gave his reasons for so doing. He would
not acknowledge that he was sorry, but knew that it was a sin,
and that the crime was punishable by death. It would thus seem
that, at the time, he not only knew the character of the act, but
that it was wrong.

The exceptions relied upon by the defendant chiefly pertain to
the charge of the court. Some criticism, however, has been made
with reference to two rulings upon the trial. The first was with
reference to a hypothetical question put to one of the medical
experts by the counsel for the defendant, which was objected to
by the counsel for the people, as assuming facts that had not
been proved. The question assumed that the defendant had
been subject to epileptic fits. The court remarked that there
was no proof of epilepsy here. The ruling was not excepted to,
but the examination of the witness proceeded with reference to

epilepsy and epileptic fits, after which the question was renewed, assuming that the defendant was subject to epilepsy, and it was answered. At the time the court made its remark that there was no proof of epilepsy, the only evidence upon the subject was that given in reference to the defendant's falling while in the kitchen, and becoming unconscious, to which attention has already been called. No evidence at the time of the ruling had been given as to whether it was an epileptic seizure or a mere fainting fit. The ruling, therefore, at that time, was not objectionable; and if it was, it was cured by the subsequent ruling permitting the question in substantially the same form to be answered.

Again, Dr. Barber, in answer to a hypothetical question which concluded in asking for his judgment as to what would be the man's mental condition at the time of the shooting, answered that, under the circumstances, he did not believe the man would be responsible for his acts. The answer was stricken out, the court remarking that " the responsibility for crime or act has involved in it not only a medical principle, but also a legal. Give us an answer to the question. He asks what his mental condition was, not whether he is responsible or not." To this the witness answered: "I should think his mental condition would be in a very excitable condition, and that he would not realize what he was doing." We think the ruling of the court was proper. The first answer given embraced a conclusion of law which was not called for by the question, or proper to be included if it had been. The last answer given was proper in form, and was a complete answer to the question.

At the conclusion of the evidence, the defendant asked the court to charge " that the jury are bound to believe the testimony of any disinterested witness which is not contradicted, and which is not in itself improbable; that officer Kupfrain, who testified to this defendant's fit, to his hot temper, to his quarrelsome disposition, to his fights, his fits of passion, and to his confused actions subsequent thereupon, is such a witness." The court declined to so charge, and the defendant took an exception. The appellant has submitted an earnest and elaborate argument in support of the proposition embraced in his request. It therefore demands a candid consideration, although we had supposed that

this question had been long settled, and no longer remained open for doubt. The cases upon which the appellant relies are all civil, and not criminal. He quotes largely from the case of Loomer v. Meeker, 25 N. Y. 361–363. In that case the action was upon a promissory note for the sum of $1,000, and the defense was that it was an accommodation note, made for the pur- pose of discount at a usurious rate of interest, and that $100 had been paid as usurious interest. The evidence upon the trial on the part of the defendant was undisputed, and established a complete defense to the action. The court, on review, speaking in reference thereto, says: " The witness was not impeached or contradicted. His testimony is positive and direct, and not in- credible upon its face. It was the duty of the court and jury to give credit to his testimony. The positive testimony of an unim- peached, uncontradicted witness can not be disregarded by court or jury arbitrarily or capriciously. They are bound to believe for judicial purposes, such testimony ; and it would, in an instance like this, be the clear duty of the court to set aside the verdict of a jury founded upon a disbelief of clear, uncontradicted, and un- disputed evidence. In Kavanaugh v. Wilson, 70 N. Y. 177, Earl, J., says: " It is undoubtedly a general rule that when a disinterested witness, who is in no way discredited, testifies to a fact within his own knowledge, which is not of itself improbable, or in conflict with other evidence, the witness is to be believed, and the fact is to be taken as legally established, so that it can not be disregarded by court or jury." It will be observed that the words " unimpeached," " discredited," and " not incredible," are used in the cases, but we find no such words in the request. A witness may be discredited even when not contradicted. The examination may disclose that the witness was of bad character, a criminal and perjurer, and yet it may not be within the power of a party to contradict his testimony. His manner upon the witness stand, his halting and quibbling in answering questions, may satisfy both the court and jury that he is swearing falsely, and yet no witness may be in existence that could contradict his testimony. He may have told a probable story, and yet it may have been false, and rendered incredible by reason of his character, and manner. The rule, however, has no application to criminal

cases. In civil cases the jurors are not the sole judges of the facts. It is only the controverted questions that are submitted to them. The credible, unimpeached, undisputed evidence is for the court, and it may nonsuit or direct a verdict thereon in favor of either party, as the facts may require. Not so, however, in criminal cases. True, the court may advise an acquittal in criminal cases, under a provision of the Code of Criminal Procedure (section 410). But it can do no more. It can not order or even advise a conviction. The rules of evidence in civil cases are applicable also to criminal cases, except as otherwise provided by the Code (section 392); but by section 419 it is provided: "On the trial of an indictment for any other crime than libel, questions of law are to be decided by the court, saving the right of the defendant to except; questions of fact, by the jury." And by section 420 it is provided that, "in charging the jury, the court must state to them all matters of law which it thinks necessary for their information in giving their verdict; and must, if requested, in addition to what it may deem its duty to say, inform the jury that they are the exclusive judges of all questions of fact." It will thus be seen that the rules of evidence in civil cases are applicable also to criminal cases, except that in criminal cases the jurors are the exclusive judges of all questions of fact.

The question presented is therefore answered by the express provisions of the Code. This enactment is but a reassertion of the common law. In People v. Upton, 38 Hun, 107–109, it is said that "it is the true theory and fundamental principle of the common law, in trial of criminal cases, for the court to adjudicate upon all questions of law, and for the jury to adjudicate upon all questions of fact." Duffy v. People, 26 N. Y. 588; McKenna v. People, 81 N. Y. 360; Howell v. People, 5 Hun, 620, affirmed 69 N. Y. 607; Com. v. Anthes, 5 Gray, 185; Pennsylvania Co. v. Versten (Ill. Sup.), 30 N. E. 540; 2 Thomp. Trials, § 2418; 29 Am. & Eng. Enc. Law, 766.

The defendant also asked the court to charge "that if the jury find that, at the moment of shooting, the defendant had sufficient reason to know the nature and quality of his act, that it was wrong; but that, nevertheless, he would not have done it but for a sudden fit of passion, they cannot convict him of the crime

charged in the indictment." This was refused, and we think properly. He undoubtedly was angered, and did the shooting while in a fit of passion; but, if it was done with deliberation while in a fit of passion; but, it was done with deliberation and premeditation, it would be murder, as charged.

The defendant also asked the court to charge "that if the jury believe that the defendant's mother, in her lifetime, was insane, and that insanity is hereditary, they must take that fact into consideration in determining the question of the defendant's insanity at the moment of the shooting." The court declined to charge that they "must," but charged that they "may" take into consideration any fact which is established in the case, and, if they believe those facts are established, they may take them into consideration. An exception was taken by the defendant. We think that, as an abstract proposition of law, the trial court was wrong in using the word "may" instead of "must," for it was the duty of the jury to take into consideration all of the facts established by the evidence, and it had no option to disregard such facts in part. But, notwithstanding this, we do not regard the instruction as requiring a new trial. The court was not required to charge in reference to specific items of evidence selected by counsel, but could only properly be called upon to charge generally with reference to the facts proved. The court had already charged fully upon the subject, but subsequently expressly charged "that the jury must consider all the evidence bearing upon the defendant's mental capacity;" thus, in effect, reversing the ruling excepted to. The evidence in reference to the mother's insanity is very meager and unsatisfactory. Certain acts have been described. The cause or duration have not been given. She appears to have been a woman at service in a hotel up to about the time that the defendant was called home in consequence of her sickness. She was about sixty years of age at the time she died. There is no other evidence tending to show that her insanity was hereditary. There is no evidence that her mind was in any manner affected in early life. Whether her trouble resulted from hereditary taint, her period of life, or other causes, we are left without the means of ascertaining, so that, in case the court had declined to charge as requested, and withheld its further comments, there would

have been no error; and, in view of the subsequent charge made upon the same subject, we think the ruling should be disre- garded.

The trial judge indulged in some comments with reference to the pardoning power of the governor, and the duty of the jurors, which have been criticised by counsel. The comments might properly have been omitted. Some of the remarks were with- drawn, others modified. We discover no such departure from established rules as to require a new trial.

Other requests were made, but none require discussion. The judgment and conviction should be affirmed.

MARTIN, J. (dissenting).—I am of the opinion that the judg- ment in this case should be reversed, upon the grounds:

1. That the court erred in refusing the defendant's request to charge that "if the jury believe that the defendant's mother, in her lifetime, was insane, and that insanity is hereditary, they must take that fact into consideration in determining the question of the defendant's insanity." In response to this request, the court charged the jury that if it believed that the defendant's mother was insane, and that insanity was hereditary, it "might" take those facts into consideration, but declined to charge that it "must." I know of no principle upon which it can properly be held that a jury may refuse to consider material evidence which it believes. It seems to me that the defendant was entitled to the instruction asked for, and that the defendant's exception to the refusal of the court to charge as requested was well taken.

2. The court, in its charge, instructed the jury as follows: "The jury have a good deal of power. If you render a verdict against the defendant, and he feels himself aggrieved, why, he can review it and reverse it. When you render a verdict of not guilty, either of the higher or lower degree, that ends it. The people cannot appeal." This was excepted to by the defendant. To instruct the jury that the defendant, if he felt himself aggrieved, could review and reverse the verdict, was clearly wrong. It was both incorrect and misleading. Its direct ten- dency was to induce the jury to find a verdict against the de- fendant with less consideration and upon less proof than it would

otherwise require. The natural effect of this portion of the charge was to lead the jury to believe that if the defendant was found guilty, and felt himself aggrieved, he could reverse its decision, and, consequently have another trial or be discharged. I can hardly imagine a statement to a jury which would be more effective to produce a conviction. This instruction could not have been otherwise than prejudicial to the substantial rights of the defendant, as its direct tendency was to deprive him of a fair consideration by the jury of the controverted questions of fact.

I do not see how a reversal of the judgment can fairly be avoided. I think it should be reversed, and a new trial granted.

ANDREWS, C. J., and GRAY, O'BRIEN, and VANN, JJ., concur with HAIGHT, J., for affirmance. BARTLETT, J., concurs with MARTIN, J., for reversal.

|  Judgment and conviction affirmed.