# COURT OF APPEALS,

## April 25, 1911.

## PEOPLE v. THOMAS BARNES.

### (202 N. Y. 77.)

(1.) MURDER—EVIDENCE HELD SUFFICIENT TO SUSTAIN VERDICT.

Evidence upon the trial of a defendant indicted for the crime of murder in the first degree examined and held sufficient to sustain a verdict convicting the defendant of the crime charged.

(2.) SAME—DELIBERATION.

The law does not prescribe any particular length of time as necessary for the deliberation which is an element of the crime of murder in the first degree. It is only essential that it shall be long enough for the perpetrator to decide between not doing and doing the act, and when the question has been properly left to the jury their conclusion will not be disturbed unless it was against the evidence or against the weight of evidence, or without evidence to support it.

(3.) SAME—EVIDENCE—WHERE PERSON KILLED PROVED TO HAVE BEEN CON-
VICT, MAY BE SHOWN THAT HE WAS PARDONED.

Where, upon the cross-examination of a witness for the prosecution, it was shown that the person who was killed had been imprisoned in a United States penitentiary for breaking into a post office, it was proper to permit the prosecution to show that such imprisonment had been terminated by his pardon.

(4.) SAME—JURY—EFFECT OF INSTRUCTION THAT TESTIMONY IS IMMA-
TERIAL.

It is to be presumed, as a general rule, that an instruction to a jury, that testimony is immaterial and of no probative force and should not be considered by them, will efface all prejudice, if any prejudice has resulted from such testimony.

(5.) SAME—EVIDENCE HELD TO BE EITHER WITHIN SOUND DISCRETION OF
TRIAL JUDGE.

Exceptions by defendant to the admission of evidence for the prose-

cution examined and held that the admission of such evidence was either within the sound discretion of the trial judge or harmless, or cured by instructions to the jury to disregard it as immaterial and of no probative force.

APPEAL from a judgment of the Kings County Court rendered April 25, 1910, at a Trial Term, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Edward J. Reilly* and *Frank G. Milligan,* for appellant. The verdict of the jury to the effect that the defendant premeditated and designed the death of Leonard was not established beyond reasonable doubt. (People v. Fitzgerald, 156 N. Y. 253; People v. Kelly, 11 App. Div. 495; People v. Harris, 136 N. Y. 423; People v. Ledwon, 153 N. Y. 10; People v. Owens, 148 N. Y. 648; People v. Gluck, 188 N. Y. 167; People v. Mangone, 29 Hun, 259; People v. Raffo, 180 N. Y. 434; Stokes v. People, 53 N. Y. 164; People v. Beckwith, 103 N. Y. 360; People v. Conroy, 97 N. Y. 62.) The court erred in admitting testimony on the trial of the action which seriously prejudiced the defendant's case. (People v. Sharp, 107 N. Y. 427; People v. DeGarmo, 179 N. Y. 130; People v. Gibbs, 93 N. Y. 470; People v. Schulman, 80 N. Y. 376; People v. Bean, 67 N. Y. S. R. 36; Stokes v. People, 63 N. Y. 164; Coleman v. People, 52 N. Y. 82; People v. Greenwald, 108 N. Y. 302; People v. Molineux, 168 N. Y. 264; Mitchell v. Costa, 14 Hun, 448.) The admission in evidence of the pardon from the president of the United States to the deceased was grave error and calls for the reversal of the judgment. (People v. Schlesler, 196 N. Y. 476.) It was error to admit in evidence the testimony of Catherine and Willie Kane. (People v. Greenwald, 196 N. Y. 296; People v. Fitzgerald, 156 N. Y. 253; People v. Bennett, 49 N. Y. 137; People v. Owens, 148 N. Y. 648; People v. Sutherland, 154 N. Y. 345; People v. Disner, 192 N.

Y. 80; People v. Smith, 172 N. Y. 234; People v. Corey, 148 N. Y. 476; People v. Koerner, 154 N. Y. 355; People v. Wood, 126 N. Y. 249.)

*John F. Clarke,* District Attorney, for respondent. There was no error in the admission of evidence. (Reed v. State, 65 Ark. 475; Hunicut v. State, 18 Tex. App. 498; Cox v. Cox, 26 Penn. St. 375; Spaulding v. Saxon, 6 Watts [Penn.] 338.)

WILLARD BARTLETT, J.:

At about two o'clock on the morning of February 22, 1910, in the basement of the house No. 266 South Fourth street, in the borough of Brooklyn, John T. Leonard was killed by a pistol shot fired from a revolver in the hands of the defendant Thomas Barnes. Of this fact there is no question. The case is devoid of any doubt either as to the fact of the killing or the identity of the slayer. The defense was justifiable homicide. The defendant denied premeditation or deliberation and gave an account of the occurrence which, if true, would have warranted the jury in finding that he was attacked and fired upon by Leonard in the first instance and only returned the fire, with fatal effect, when it appeared to be necessary in order to preserve his own life. The jury refused to believe his testimony to this effect, however, and declared him guilty of murder in the first degree. His counsel upon this appeal insist that there is no evidence in the record to sustain a conviction of this grade of felonious homicide, and argue that in any event the charge should have been reduced to manslaughter in the first degree before the case was submitted to the jury.

This is really the gravest question in the case, as there is no readily discernable motive for the crime and the defendant denies any acquaintance with the deceased previous to the killing. A careful study of the record, however, has convinced me

that there is a view of the facts which furnishes ample support for the verdict.

Both the defendant and the deceased were men of criminal antecedents. The defendant had served terms of imprisonment in the Albany penitentiary and on Blackwell's Island; and the deceased had been convicted of conspiracy and breaking into a post office in North Carolina and sentenced to imprisonment in the United States penitentiary at Atlanta, from which he was released by pardon in December, 1909. Leonard then came to Brooklyn, and he and his wife were keeping a lodging house for men at 266 South Fourth street when the homicide was committed.

Mrs. Leonard was the chief witness for the prosecution. She testified that she first saw the defendant two weeks before the shooting in the room of one of her lodgers named Goldie. She went to the room to change the bed, according to her custom. Her husband was in the hall, fixing a lock on the door of the next room and he told her there was company in there and he did not think she could go in. She went in, nevertheless, but finding too many persons there, told Goldie so, whereupon he said it was all right, he would do the work to-morrow morning himself. At this time the defendant was in Goldie's room, and Goldie himself, and a man named Wilson and two other men who were strangers to Mrs. Leonard. This testimony is important as bearing upon the defendant's knowledge of Leonard previous to the homicide. If true, it shows that the defendant was where he could have seen him and probably did see him two weeks before. The defendant, on the other hand, denies ever having made any such visit to Goldie's room at all.

The next time that Mrs. Leonard saw the defendant was on the evening of the 21st of January, 1910, between half-past seven and eight o'clock, when he called at the house and asked for Mrs. Leonard. She heard him and stepping forward in the hall said she was Mrs. Leonard, whereupon he asked her whether

Mr. Leonard was at home. She said no, but she expected him at eight o'clock. The defendant then inquired whether " any of the boys " were at home. Mrs. Leonard said: " Which of them ? "· He repsonded: " Is Goldie in ? " and just then a lodger named Anderson called out: " Hello, friend! " from upstairs and the defendant went up to one of the floors above. Mrs. Leonard asked: " Who will I say wants to see him ? " when Mr. Leonard came home and the defendant answered: " Tell him Arthur. He will know who it is." She did not actually see the defendant come down and leave the house but she knew that three or four of the men went out between nine and ten o'clock.

Leonard and his wife roomed in the basement, their bedroom being in the front of the house and their kitchen in the rear. According to Mrs. Leonard's testimony her husband came home at eleven o'clock, went up to Anderson's room to find out who had been there to see him and then came downstairs and they both retired at about fifteen minutes after midnight. She was awakened shortly before two o'clock by somebody knocking at the front basement door, the door of the room in which they slept. This was followed by knocking at the kitchen door in the rear, whereupon Mrs. Leonard called out asking who was there. There was no response to her inquiry but further knocking followed at the front door again. Meantime Mrs. Leonard had aroused her sleeping husband, who in turn asked who was there, when the voice of Anderson was heard in the hall saying: " Never mind, Jack, I will see you in the morning." Leonard responded: " It is all right; I want to see you anyway," and putting on some of his clothes went into the kitchen, lit the gas there, unbolted the kitchen door leading out into the hall and had just about entered the hall when his wife heard four shots fired in rapid succession. Her husband jumped back into the kitchen and exclaimed: " Oh, Mary, I'm struck; I'm done for," and fell to the floor mortally wounded and unconscious. Mrs.

Leonard was about to seek help, but was prevented from going out into the hall by the noise of breaking glass in the front basement door, which subsequently proved to be due to the efforts of the defendant to escape in that way. She got out of the house by the basement window and called for help to a man whom she saw on the sidewalk a short distance from the gate. She then saw the defendant on the front stoop coming down the steps and pointed him out as the man who had shot her husband. In company with this man whom she thus addressed and some other bystanders she followed the defendant out to the Wililamsburg Bridge plaza, where he was arrested by an officer, who brought him back to the place where Leonard lay dying. The deceased was about breathing his last, but the defendant when taken into his presence said nothing. Mrs. Leonard testified that although her husband had carried a revolver prior to his imprisonment at Atlanta, he was not armed after that, and did not have a pistol on the night of the homicide. The defendant resisted arrest by striking the officer on the cheek with the butt-end of his revolver so severely as to draw blood. His person was searched and there were found upon him eighteen cartridges in a bag, a flashlight dark lantern, a coil of fuse and a quantity of percussion caps, such as are used for setting off a blast. When questioned at the station house concerning the homicide. he said to the sergeant in charge: " What are you trying to do, kid me ? " The cartridges found upon him were of the same calibre as his pistol (38), and five empty shells of the same calibre were picked up in the hallway on the parlor floor of the Leonard house where the defendant is supposed to have opened his revolver and ejected them immediately after the shooting.

The defense of justifiable homicide rests wholly upon the testimony of the defendant himself. He denied that he had ever visited the premises No. 266 South Fourth street before the evening preceding the shooting. He said he came to go there at the suggestion of Goldie, whom he had met a short time pre-

viously when they were both inmates of the same ward in a hospital in New York. "I could get a room there for a reasonable price," he said, "a couple of dollars or two and a half, and if I wanted a girl I might get a girl there. It was a neighborhood of that kind. His testimony agreed with that of Mrs. Leonard as to his calling at the house on the evening of the 21st of February and asking for Mr. Leonard, but he said that he inquired for Goldie after being told that Mr. Leonard was not in. Thereupon Anderson, whom the defendant swore he had never seen before, looked over the head of the stairs and called out, "Hello," and the defendant went up to the first floor where he was standing. He told Anderson that he had been in the hospital and was "all in;" that Goldie told him he could get a room there; that there were a couple of women downstairs, one of whom said she was Mrs. Leonard, but he did not care about giving her his money until he saw the proporietor who ran the house, Leonard, and he would give him the money to get his room. Anderson told him that he expected Goldie right back, whereupon the defendant went to Goldie's room and waited there an hour or so talking with Anderson, who mentioned a mutual acquainance—a woman who kept a saloon in Montreal. He then proposed to Anderson to go out and have a drink and they went together to a liquor saloon on the same block where they met Goldie and another man, Wilson, to whom the defendant was introduced. They stayed there until it was time to close the place and they were put out. In the street Goldie and Wilson went off with two girls, Goldie saying that he would make a night of it and telling the defendant to go down and sleep in his room. The defendant then returned to the Leonard house with Anderson. According to his testimony they were all "pretty drunk." He told Anderson that if he went up and slept in Goldie's room Goldie might come back in the night and sleep on the floor and said he would go down and see "this fellow," meaning Leonard. Going down into the basement he

tripped and fell and " woke up at the bottom," to quote his
language. As he was picking himself up Anderson called out :
" You are waking the whole God damned house up. Get back
and go to bed." The defendant heard Leonard's voice and
Anderson said : " Never mind, Jack, it is all right. I will see
you to-morrow," and started upstairs. Leonard came out into
the hall which was either dark or very dimly lighted. The de-
fendant started to explain to him about getting the room, men-
tioning Goldie ; I quote his testimony from this point : " He
says, Goldie sent you over here ? ' He says, ' You bum, get
out of here,' and he made a pass at me and struck me here in
the side of the head. I came back with another pass, and he
kicked me in the private and I went down. I fell to the floor,
and I says, ' You rotten son-of-a-bitch,' and he faced back
towards the door and he says, ' I will give you one second to get
out of here,' and I was in the condition on that floor that I
couldn't get out of there, and being strapped up and I got a
large rupture, and I couldn't get up off that floor, and the next
thing I heard, bang, and I reached around my back pocket and I
pulled my gun and I let go. Why did I shoot my revolver ?
Why, it was his life or mine. That is why I shot my revolver,
and I would do it now if I were in the same position. That
is why I done it."

The theory of the prosecution was that the defendant and
certain criminal associates of his in the borough of Manhattan
were inspired with animosity toward Leonard because they
feared him as an informer. The district attorney denominated
these criminals " yeggmen," which it seems is a term applied to
post-office and bank robbers. Leonard had recently been par-
doned by the president after conviction of a crime of the charac-
ter committed by " yeggmen," and his associates might well fear
revelations made by him to the officers of the government. This
feeling may not have gone so far as to result in a determination
to kill him, but it might naturally have created a sentiment of

hostility on the part of the defendant. If the testimony of Mrs. Leonard was true—and the jury must have accepted it as true—her husband did nothing on the occasion of the homicide which could possibly have warranted the defendant in supposing that Leonard meant to harm him or could harm him, still less dŏ any act which would endanger his life. Even if the defendant had little previous knowledge or information concerning Leonard and was not actuated by any fear that he might turn state's evidence, the jury might well have thought that the defendant, enraged by the language which Leonard used and having him completely within his power in the obscurity of the basement hall, then and there resolved to kill him. The law does not prescribe any particular length of time as necessary for the deliberation which is an element of the crime of murder in the first degree. It is only essential that it shall be long enough for the perpetrator to decide between not doing and doing the act. (People v. Boggiano, 179 N. Y. 267.) It cannot be held as matter of law that the time was insufficient in this case. That question was properly left to the jury. I cannot say that their conclusion was against the evidence or against the weight of evidence or that it was without evidence to support it.

There are forty-three exceptions in the record, most of which are obviously so untenable as not to require any discussion. A few of them, however, require notice. To understand these it is necessary to mention some facts to which reference has not yet been made.

The evidence left no doubt that the defendant had fired five shots, and special pains were taken by the prosecution to prove the location from which these shots must have been fired, as well as the direction of the shots, and to find the five bullets. Five shells fitting the defendant's pistol had been found in the upper hallway near the hat rack, but prior to the 28th of March only four bullets had been discovered. The case originally came on for trial on March 25, 1910, but was adjourned on the applica-

tion of counsel for the defendant until the 18th of April, 1910, when the trial began. On the 28th of March the district attorney caused further search to be made for another bullet in the hall of the basement of the Leonard house and the fifth bullet was discovered. The search was made with great care by a surveyor, a police captain and an expert photographer. At this time there were no traces of any bullet holes in the walls of the basement hall, nor were any other bullets found. A week later counsel for the defense requested the same photographer to visit the premises with him, and he pointed out to the photographer two bullet holes in the wall opposite the kitchen door which the other evidence conclusively shows were not there on the 28th of March. Subsequently on examining the boards containing these new bullet holes two 32-calibre bullets were found, one of them in the coal bin. There is no reasonable doubt that these bullets had been fired into the wall subsequent to the homicide. The house had been unoccupied after the 14th of March. The lessee was one John Cavanagh, a New York liquor saloon keeper, under whom Leonard occupied the premises. His partner in business was a man who is denominated Chi-Jack in the record, and Cavanagh testified that he had seen the counsel for the defendant talking to this partner of his in the middle of March or thereabouts. While expressly exonerating the counsel for the defendant from any charge or suggestion of complicity in the scheme, the theory of the district attorney was that some of the friends of the defendant in Manhattan had caused these two shots to be fired from a 32-calibre revolver in the basement of No. 266 South Fourth street subsequent to the murder for the purpose of lending credibility to the plea of self-defense. It is to be noted that no reference is made to these bullets in the argument of defendant's counsel. It has been necessary to mention this incident in order to show the admissibility of certain evidence which was received over objection and exception in behalf of the defendant. Catherine Kane, a girl of seventeen,

who lived with her parents next door to the Leonard house, and Willie Kane, her younger brother, testified in substance that after the Leonard house had become vacant and on the night of the 31st of March between ten and eleven o'clock they heard a report in the house next door which sounded as if something had fallen over, so that they wondered if the ceiling was falling down in their own home. Their parents were out at the time, but they told them about this crashing noise when they came home and subsequently reported it to the police captain of the precinct. This evidence was plainly relevant, as the noise might have been made by the firing of a pistol and the testimony of these witnesses thus tended to show an attempt to fabricate a defense. It is argued that in any event such testimony was only proper upon rebuttal, but I think that it was within the discretion of the trial judge to allow the prosecution to anticipate and defense which might be based upon the finding of the 32-calibre bullets and to account for their presence in the premises as a part of the principal case for the People.

The only other exceptions of any consequence may be disposed of briefly. Upon the cross-examination of Mrs. Leonard objections by the prosecution to a series of questions intended to show that the deceased carried firearms were sustained and the defendant duly excepted. At that time there had been no suggestion, nor was the district attorney aware that the defendant would rely upon self-defense as a justification for the shooting. After it became apparent that this was to be the defense the district attorney recalled Mrs. Leonard to the stand, withdrew the objections that he had previously made and consented to any questions being asked along that line. This action, I think, deprived the exceptions of any force; as it afforded counsel for the defendant the fullest possible opportunity to ask the questions which had been ruled out. No error was committed in receiving in evidence the pardon of Leonard. Upon the cross-

examination of Mrs. Leonard the defense had proved the fact of her husband's imprisonment at Atlanta, and under these circumstances it was entirely proper for the prosecution to show how that imprisonment was terminated. Exception was also taken to the testimony of a post-office inspector and a detective in reference to their business relations with Leonard, and his connection with the investigation of post-office burglaries. Nothing material or damaging to the defendant was elicited on the examination of either of these witnesses but in any event if error was committed in receiving their testimony it clearly was cured by the action of the court in strinking it from the record and directing the jury to eliminate it entirely from consideration, " as though it had not been presented at all." It is to be presumed, as a general rule, that an instruction to a jury that testimony is immaterial and of no probative force and should not be considered by them, will efface all prejudice, if any prejudice has resulted from such testimony. (State v. Fortin, 106 Maine, 382.)

Some of the reasons which may well have led the jury to reject the plea of self defense readily suggest themselves to the mind. In the first place, the only voice which Mrs. Leonard and, therefore, presumably Leonard himself, recognized in the hall before Leonard went out was the voice of Anderson, a lodger in the house, with whom Leonard's relations appear to have been entirely friendly. Even if he had a pistol on the premises there was nothing in the circumstances to arouse any apprehension of danger or to lead him to arm himself before going out. In the second place, it is to be noted that Leonard was shot in the back. When this fatal shot was fired it is perfectly certain that the deceased was in the act of flight from his assailant. This is not the usual attitude of a man who is trying to kill another. Finally, the defendant when arrested, instead of saying anything about an assault upon himself as a justification for his act, violently resisted arrest and made an assault

upon the officer. These facts, taken together, weigh strongly against the story of the defendant.

There is nothing in the law or the facts of this case which would justify us in interfering with the verdict. It is true that no adequate motive for the crime is plainly discernable, but if satisfactory proof of motive were essential to uphold a conviction of murder many wicked criminals would escape the punishment which they deserve. I think it is our duty to affirm this judgment.

CULLEN, Ch. J., VANN, WERNER, HISCOCK and CHASE, JJ., concur ; HAIGHT, J., absent.

Judgment of conviction affirmed.

---

# NOTE ON DELIBERATION AS AN ELEMENT OF MURDER.

GENERALLY.

The design to kill must have been formed before it was put into execution. People v. Brunt, 11 N. Y. St. Rep. 59.

While there must be deliberation as well as premeditation to establish the crime of murder in the first degree, if the killing is not the instant effect of impulse, if there is hesitation or doubt to be overcome, a choice made as the result of thought, however short the struggle, it is sufficient to characterize the crime. Leighton v. People, 88 N. Y. 117.

The fact that a fatal act was done in anger, and while in a fit of passion, does not save it from constituting murder in the first degree if it was done with deliberation and premeditation. People v. Tuczkewitz, 149 N. Y. 240.

It is said that the deliberation need not relate to the actual victim. If when defendant arms himself he intends to kill anyone who may oppose him or try to arrest him, the deliberation begins then, although he has no definite person in mind. People v. Sullivan, 173 N. Y. 122.

The execution of the guilty purpose is required to be settled and deter-

mined upon reflection, before the crime of murder in the first degree can be committed, and a free and determined purpose is rendered necessary as distinguished from a mere impulsive fatal act. People v. Mongano, 1 N. Y. Crim. 413.

There is no such thing in law as a grade of insanity that changes the crime of homicide from one degree to another, but it seems that in a proper case such evidence is admissible to show the absence of a deliberate and premeditated design. Sindram v. People, 1 N. Y. Crim. 448.

If there be sufficient deliberation to form a design to take life, and to put that design into execution, by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow, or whether it be contemplated for months. People v. Ferrarol, 4 N. Y. Crim. 266.

To constitute murder in the first degree, something more than the actual presence of intention formed at the instant of striking the blow or firing the shot, is necessary. There must be a deliberate design to effect death, distinguishable from a suddenly formed intention without deliberation, and it must appear that there was some actual deliberation operating in and upon the mind of the accused in respect to the subject matter of the offense, before the actual occurrence of the fact which is alleged to be criminal. People v. Walworth, 4 N. Y. Crim. 355.

The "other kind of wilful, deliberate, or premeditated killing" is not restricted to the same kinds of murder as are previously enumerated in the statute. People v. Bealoba, 17 Cal. 389.

If a homicide be wilful and premeditated, but without deliberation, it is not murder in the first degree. Nye v. People, 35 Mich. 316; People v. Brunt, 11 N. Y. St. Rep. 59.

If the circumstances attending the killing indicate that it was wilful, deliberate, and premeditated, and there are no mitigating circumstances, the crime is murder in the first degree. State v. Jackson, 167 Mo. 291.

Under statutes requiring the killing to be "wilful, deliberate and premeditated" in order to make the crime murder in the first degree, all the requisite elements are material and must exist to sustain the charge. State v. Fairlamb, 121 Mo. 137; Milton v. State, 6 Nebr. 136.

It is not enough that the design to kill existed at the time of the killing. State v. Bonofiglio, 67 N. J. L. 239.

DEFINITIONS.

Deliberate means formed with deliberation in contradistinction to a sudden and rash act. Mitchell v. State, 60 Ala. 26.

It has been held that premeditation and deliberation mean the same thing. People v. Poole, 27 Cal. 572.

Deliberate and premeditated defined as thought over, considered, or previously reflected upon. People v. Poole, 27 Cal. 572.

The slayer must not only plan, contrive, and scheme as to the means and manner of the commission of the deed, but he must consider and weigh different means of accomplishing it. Craft v. State, 3 Kan. 450.

The word deliberately means the intent to take human life with a full and conscious knowledge of the purpose so to do. Jones v. Commonwealth, 75 Pa. St. 403.

Deliberate means done in a cold state of blood, and not in a sudden passion, caused by a lawful or just provocation. State v. Evans, 158 Mo. 589.

Deliberation defined as a weighing in the mind; consideration and examination of the reasons for and against; mature consideration of the subject; reflection upon the subject. Milton v. State, 6 Nebr. 136.

Deliberate means formed with a cool purpose. Dale v. State, 10 Yerg. Tenn. 551.

Deliberate means done in the furtherance of a formed design to gratify a feeling of revenge or accomplish some other unlawful purpose. Perugi v. State, 104 Wis. 230.

INDICTMENT.

Not necessary to charge deliberation in an indictment for murder while engaged in the commission of a felony. Cox v. People, 80 N. Y. 500.

The crime of murder in the first degree under an indictment for murder

in the first degree can only be shown by proof of some amount or kind of deliberation and premeditation antecedent to the act which intentionally effects the death, and of which the intent alone is not sufficient evidence. People v. Conroy, 97 N. Y. 62, 2 N. Y. Crim. 247.

## NECESSITY OF LAPSE OF TIME.

Where the intent to kill is conceived on the instant of inflicting the wound more care and caution is required from the jury where the intent is derived from a series of acts manifesting deliberation. People v. Lopez, 2 Edm. Sel. Cas. 262.

The requisite time cannot be measured by any other rule than that furnished by the circumstances of each case. People v. Brunt, 11 N. Y. St. Rep. 59.

There must be an appreciable time, sufficient for some reflection and consideration and the formation of a definite purpose, no matter how brief, if it is sufficient for this. People v. Majone, 91 N. Y. 211.

The deliberation must precede the killing by some appreciable space of time, although it need not be long, but must be of sufficient duration for some reflection and consideration upon the matter for a choice to kill or not to kill and for the formation of a distinct purpose to kill. People v. Schmidt, 168 N. Y. 568, 16 N. Y. Crim. 111.

When the elapsed time is sufficient for deliberation, it matters not how brief it is. The human mind acts with celerity, which it is sometimes impossible to measure, and whether a deliberate design to kill was formed must be determined from all the circumstances of the case. People v. Boggiano, 179 N. Y. 267, 18 N. Y. Crim. 510.

While the time for reflection is not measured in minutes and seconds, it is measured in facts; it must be long enough to make a choice, as the result of thought and reflection, and to act upon the choice made. It is impossible to measure this period by the ordinary method of measuring time, and hence it is necessary to measure it by what must be done in order to satisfy the statute which requires a deliberate design. People v. Gilbert, 24 N. Y. Crim. 480, 199 N. Y. 10.

Under the statute there must be a deliberate and premeditated design to kill, to constitute murder in the first degree, and such design must precede the killing by some appreciable space of time; but the time need only

be long enough to permit reflection and consideration, and the formation of a definite purpose to kill.  People v. Majone, 1 N. Y. Crim. 94.

To establish deliberation no particular lapse of time necessary, and it is enough if there be time for choice as the result of reflection.  People v. Kiernan, 3 N. Y. Crim. 247.

When the prisoner had time not only to form in his mind the purpose of killing deceased, but to announce that intention to his victim, and then carried it into effect, there was time enough for deliberation and premeditation, and the jury are justified in finding that such deliberation and premeditation did exist.  People v. Kiernan, 4 N. Y. Crim. 88.

No particular time is prescribed by law within which deliberation must occur to constitute murder in the first degree; the act which caused the death must be deliberate in the sense that it was not committed under the influence of a sudden and uncontrollable impulse produced by a proximate cause.  People v. Druse, 5 N. Y. Crim. 10.

Held that the facts showed that there was time in abundance for reflection and deliberation, and that his acts seemed to show a purpose and plan which ended in the murder, and that on these facts the jury did not err in returning a verdict of murder in the first degree.  People v. Van Brunt, 8 N. Y. Crim. 227.

There is no hard and fast rule as to the time necessary for a defendant to deliberate the design to kill; it is always a question for the jury in the light of the facts.  People v. Conroy, 12 N. Y. Crim. 299.

The time need not be long enough for defendant to thoroughly ponder over the act and its consequences, and he need not have brooded over it.  Webb v. State, 135 Ala. 36.

The deliberation and premeditation need not exist for any particular length of time.  State v. Hockett, 30 N. W. (Iowa) 742.

No particular length of time for deliberation and premeditation is required by the law, since a deliberate purpose can readily be formed in an instant.  State v. McPherson, 114 Iowa, 492.

If the design to kill was deliberately formed, the murder will be in the first degree, even though the design is carried into effect instantly.  Keenan v. Commonwealth, 44 Penn. St. 55.

The difference in the degree does not depend on the length of time taken to form the design, or the speed with which it is executed, but upon the state and condition of the mind in which the design is formed.    Farrer v. State, 42 Tex. 265.

If the design is formed even a moment before it is put into effect and execution, that is long enough.    State v. Gin Pon, 16 Wash. 425.

EVIDENCE.

Evidence reviewed and held insufficient upon which to base a finding of the premeditation and deliberation necessary to sustain a verdict convicting the defendant of the crime of murder in the first degree.    People v. Raffo, 180 N. Y. 434, 19 N. Y. Crim. 298.

Any evidence bearing upon the element of deliberation is admissible, and evidence for the purpose of showing ill-will on the part of the defendant towards the person killed is competent.    People v. Bouser, 196 N. Y. 296, 24 N. Y. Crim. 126.

Whether the intent to kill has been made the subject of such deliberation as to create the crime of murder in the first degree, is ordinarily incapable of direct proof, and may be ascertained from the circumstances. People v. Majone, 1 N. Y. Crim. 86, aff'd 1 N. Y. Crim. 94.

Evidence reviewed fully by the court and considered, and held sufficient to show that the killing for which the prisoner was indicted, was the result of a premeditated and deliberate design to effect death.    People v. Hovey, 1 N. Y. Crim. 180.

A feeling of hostility engendered by the supplanting of defendant in the affections of his mistress by deceased, threats of personal injury against inhabitants of house where deceased lived, and the sharpening of a knife ten days before the murder, held sufficient evidence to establish deliberation.    People v. Jefferson, 2 N. Y. Crim. 240.

It is competent to show the conduct and feelings of defendant towards the victim, and the evidence of defendant's previous threats or attempts to kill that person is admissible to show deliberation.    People v. Jones, 3 N. Y. Crim. 252.

Evidence that defendant on the afternoon of the day of the shooting showed the witness a pistol, remarking at the same time that " this means business some day " is competent as tending to prove that defendant in-

tended to use the pistol upon some one. People v. Sutherland, 12 N. Y. Crim. 495.

Conflicting evidence as to deliberation held sufficient to warrant the submission of the case to the jury, and to sustain their verdict, objected to as against the weight of evidence. People v. Barone, 14 N. Y. Crim. 351.

Evidence necessary to establish deliberation discussed. People v. Tolleman, 19 N. Y. Crim. 298.

CHARGE.

A refusal to charge that upon the question of deliberation, under the facts of the case, the jury must not consider the previous threats or attempts to take the life of the deceased which have been sworn to, held no error. People v. Jones, 99 N. Y. 667.