THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.*
BENJAMIN FELDMAN, Appellant.

Reargued February 24, 1949; decided April 14, 1949.

*Rudolph Stand* and *John McKim Minton* for appellant. I. The trial court committed prejudicial error in refusing to grant defendant's several requests to instruct the jury that there was no evidence that defendant administered poison to his wife on the night of December 7th and that the jury must not consider decedent's alleged condition on December 7th as any evidence of defendant's guilt. (*People* v. *Molineux,* 168 N. Y. 264; *People* v. *Montgomery,* 176 N. Y. 219; *People* v. *Posner,* 273 N. Y. 184; *People* v. *Flynn,* 290 N. Y. 220; *Nudd* v. *Burrows,* 91 U. S. 426; *People* v. *Odell,* 230 N. Y. 481; *People* v. *Montesanto,* 236 N. Y. 396; *Andres* v. *United States,* 333 U. S. 740; *People* v. *Jenman,* 296 N. Y. 269; *People* v. *Van Aken,* 217 N. Y. 532.) II. An atmosphere of ineradicable prejudice to defendant was created in presenting testimony concerning the events in the Feldman home on December 7, 1943, despite the express admission made by the prosecutor — in the absence of the jury — that the People did not contend that defendant administered poison to his wife on December 7, 1943, as charged in the indictment. The trial court should have excluded the evidence. (*People* v. *Corey,* 148 N. Y. 476; *People* v. *Davey,* 179 N. Y. 345.) III. The trial court erred in refusing to allow defense counsel on cross-examination of the People's experts to show variances and conflicts between the opinions of the experts and that of recognized authorities. (*Hastings* v. *Chrysler Corp.,* 273 App. Div. 292; *Egan* v. *Dry Dock, East Broadway & Battery R. R. Co.,* 12 App. Div. 556; *People* v. *Harris,* 136 N. Y. 423; 2 Wharton on Criminal Evidence [11th ed.], § 1024; *People* v. *Lustig,* 206 N. Y. 162; *Roberts* v. *New York Elevated R. R. Co.,* 128 N. Y. 455; *Hoag* v. *Wright,* 174 N. Y. 36.) IV. The book on toxicology was illegally admitted in evidence and extracts read therefrom to the jury on strychnine poisoning to the substantial prejudice of defendant. (*People* v. *Waite,* 220 N. Y. 714; *Commonwealth* v. *Howard,* 205 Mass. 128; *People* v. *Zackowitz,* 254 N. Y. 192.)

*Miles F. McDonald, District Attorney* (*Solomon A. Klein* of counsel), for respondent. I. Guilt was established beyond a reasonable doubt. II. The course of the trial and the court's

charge to the jury precluded a verdict upon the theory that defendant administered poison to his wife on the night of December 7th. (*People* v. *Guardino,* 286 N. Y. 132.) III. The trial court properly refused to permit defense counsel on cross-examination of the People's experts to read from books whose authoritativeness had not been established. (*Hastings* v. *Chrysler Corp.,* 273 App. Div. 292; *People* v. *Riccardi,* 285 N. Y. 21; *Commonwealth* v. *Jordan,* 207 Mass. 259.) IV. The book on toxicology borrowed by defendant a few months before his wife was poisoned was competent evidence. (*Commonwealth* v. *Howard,* 205 Mass. 128; *People* v. *Benham,* 160 N. Y. 402; *Walsh* v. *People,* 88 N. Y. 458.)

CONWAY, J. Proof of guilt of administering poison to another, resulting in death, is always difficult and the instant case constitutes no exception. Unless there be a confession or direct testimony by observers of the act, dependence must be upon circumstances attending the event and then the question, in a capital case, which is presented to us for our consideration is whether the guilt of the accused has been established to a moral certainty by circumstances which not only point to the guilt of the accused but are inconsistent with his innocence. (*People* v. *Fitzgerald,* 156 N. Y. 253, 258; *People* v. *Razezicz,* 206 N. Y. 249, 273; *People* v. *May,* 290 N. Y. 369.)

One of the difficulties here is that there is no direct proof that the defendant had anything to do with the strychnine which it is alleged was administered to his wife, the deceased. There was no proof that he ever purchased or possessed any. As a substitute for such proof it is pointed out that the defendant was a licensed employed pharmacist and thus had access to the poison. The bottle alleged to have contained it was discarded as refuse in the hospital (contrary to good practice) by the nurse in attendance on the deceased after her death. Thus no one can say with certainty that the bottle contained strychnine. The toxicologist, who was not a physician, testified to the presence of strychnine in the organs of the deceased, other than intestines, when he performed an autopsy and analyses some five months after burial. He also testified that in discovering it, all of the organs supplied him consisting of the brain, lungs, liver, spleen, heart, kidneys, blood, empty stomach, two pieces of rib and a

male foetus, were used up and that no material is left. There is thus in existence no tangible evidence which others may check and test which would show the presence or amount of strychnine at any time in the body of the deceased. The " very few notes " made on pieces of paper from time to time during the tests which took about a week, were destroyed after being typed by the toxicologist personally, after he had completed his examination and tests. We must proceed, of course, upon the assumption, for the purpose of this opinion, that the toxicologist made no error in *estimate of quantity* of strychnine in the body of deceased and the matter is adverted to only for the purpose of indicating that the entire proof of guilt here depends on oral testimony and not upon articles or objects which can now be touched or viewed. To put it succinctly, the opinion testimony revolved about the estimate of " the total amount of strychnine in the entire body, exclusive of the gastro-intestinal tract and exclusive of the urine " and was calculated upon a body weight of 132 pounds or approximately " 60 kilos ". Moreover, the stomach showed too small a trace of strychnine to estimate it. The case against the defendant hung upon the correctness of the estimate and calculation plus the opinion testimony. It is rare when a charge in a capital case may depend upon such an " estimate " and conviction should follow only upon the clearest and unconfused proof.

In addition to the toxicologist, four experts or opinion witnesses were called upon to give testimony. No one of the five had seen Mrs. Feldman in life. The doctors who had seen and attended her at home on December 7th and in the hospital on December 8th, before her death in the early morning hours of December 9th, diagnosed her case as one of tetany accompanying pregnancy. That indicated a calcium deficiency. The five opinion witnesses called upon the trial all agreed that on December 7th, the deceased had ingested strychnine. There is no contention by the People that the accused had anything to do with that. The two opinion witnesses for the defendant gave it as their opinion that the deceased died from the December 7th ingestion. The three opinion witnesses called by the People gave it as their opinion that she did not, but died from the ingestion of strychnine in the early hours of December 9th at the hospital. There was no strychnine found at either hospital or home. If the deceased died from the ingestion of strychnine in her home

on December 7th, the accused was entitled to acquittal of the charge made. If she died from the ingestion of strychnine in the hospital on December 9th, the guilt of the accused depended on whether he had put strychnine in one of the bottles which he brought to the hospital and delivered to the nurse in attendance upon his wife and no part of the contents of which was analyzed because of the conduct of the nurse in disposing of it, to which reference has already been made.

In a case as close as this one, it is clear that it was essential for the trial court to make certain that no error in the admission or exclusion of evidence occurred and that there was no confusion as to facts. Concededly that was not an easy task. It is against the background outlined that we consider some of the facts and some of the rulings made.

The proof offered on this trial and on the first trial of the defendant was substantially the same except that an error in admission of evidence was not repeated. (See *People* v. *Feldman*, 296 N. Y. 127.) Moreover, any claim that the defendant was interested in another woman has been abandoned. The People did not engage two of the experts called on the first trial but substituted two others in their places. The People also called as a witness one Wilkoc who had not testified theretofore. His testimony will be discussed later.

On the night of December 7, 1943, the deceased was visited by her sister about nine o'clock. She was alone while her husband, the defendant, was on duty at the drugstore in which he was employed. Following her sister's visit, she became ill and suffered convulsions. Her condition was diagnosed as a calcium deficiency by two physicians and she was removed before midnight to a hospital. The defendant had requested the first doctor called to engage a consultant. At the hospital Mrs. Feldman had a convulsion at nine o'clock in the morning of December 8th, and then improved. Shortly after noon of that day a third physician, a specialist in '' tetany and calcium metabolism '' was engaged at defendant's insistence. The defendant on December 8th had suggested that it might be well to get a doctor from Johns-Hopkins Hospital but was told that the first two doctors consulted had selected for further consultation the specialist in tetany to whom reference has been made. That specialist reached the hospital at six o'clock in the evening and

found Mrs. Feldman comfortable. The only troublesome symptom was that Mrs. Feldman complained of some tenderness in her feet. The doctor thought her condition was " strongly suggestive of hypocalcemic tetany of pregnancy " and finding the prognosis good he dictated a prescription consisting of " 60 grains of calcium chloride in 150 c.c. of elixir lactate of pepsin " to be administered every four hours. That prescription would be contained in six bottles. It was designed to build up calcium content of the blood. He also prescribed a patented medicine known as hytakerol to be given once a day. That consisted of highly concentrated vitamin D.

One of the doctors met defendant in the corridor, told him his wife might be suffering from tetany " and if so the patient would be very much better by tomorrow, and from all indications she ought to do very well." Defendant was then given the two prescriptions which had been written on a prescription pad. He was told that he could get the hytakerol at the pharmacy of one Jacoff and while there he might as well have the other prescription filled.

The defendant went to Jacoff's pharmacy and obtained the hytakerol. He was driven there by the husband of his wife's sister, one Kushner. Then Kushner drove him to the drugstore of Ruvinsky where the defendant was employed. There defendant asked one Rothbaum to help him make up the prescription. The defendant prepared the bottles individually, weighing out each quantity prescribed separately and putting it into the bottle then under preparation. Ruvinsky and Rothbaum said that there was nothing unusual about the method of preparation. The largest graduate measure used in the store held but thirty-two ounces. To put thirty ounces as required by the prescription for the five-ounce bottles into the quart measure would render it difficult to stir the compound without spilling it. Rothbaum helped defendant get out the calcium chloride and lactate of pepsin. After the preparation of the first two bottles was completed, Rothbaum left for his home. Ruvinsky was busy waiting on customers but could see the defendant if he looked toward him. There was a cabinet of poisonous drugs near the defendant but no proof that he opened it. After preparing the six bottles containing the medicine he was driven with them, again by Kushner, at about ten-thirty in the evening to the hospital where

he knocked on his wife's door and placed them and the bottle of hytakerol in the hands of nurse Bierle. Shortly thereafter contents of one of the six bottles was administered to Mrs. Feldman. At two-thirty on the morning of December 9th, nurse Worrell, who had succeeded as the attending special nurse, administered the second bottle. One-half hour later the deceased was seized with a convulsion. She died one hour later at four o'clock. The nurse thereafter threw out all of the six bottles. The cause of death certified was " tetany with convulsions; cause unknown, associated with pregnancy ".

The toxicologist who performed the autopsy testified that he estimated from his three analyses of specified grams of brain, liver and of a composite sample of heart, brain, liver and blood that there were 3.7 grains of strychnine in the body of deceased. As we have mentioned earlier, the experts for the defendant gave it as their opinion that death could have been caused by " a quantity of strychnine ingested by her twenty-eight hours before "; that the medication administered in the hospital would have tended to postpone death by delaying convulsions and stopping or slowing down intestinal movements. The experts for the People said that that was impossible; that the deceased must have ingested less than a lethal dose on December 7th and must have practically eliminated it from her system; that death was caused by the ingestion of strychnine at two-thirty on the morning of December 9th. Thus the finding of guilt depended on which opinion witnesses the jury believed. The defendant's experts gave it as their opinion that Mrs. Feldman ingested strychnine once — on the 7th day of December. The People's experts gave it as their opinion that she ingested strychnine twice — once on the 7th and again on the 9th. All that was opinion based in the final analysis on the testimony of the toxicologist that on autopsy he found strychnine in the organs of the deceased.

If there was but one ingestion instead of two, the defendant must be acquitted of guilt. That is conceded. Thus the assistant district attorney stated to the court early in the trial *after the jury had been excluded*: " I will also frankly state to the Court that it is not the contention of the People that the alleged strychnine poisoning of which the deceased was stricken on December 7th, 1943, was administered by or through any means on behalf

of the defendant; that the People will claim on this trial that the strychnine poisoning of which this deceased died was administered to the deceased by and through the agency of the defendant only on the 9th day of December, 1943.''

We cannot find that the *jury* was ever told that by the court although, as we shall see, the court was requested specifically to make that charge.

When the assistant district attorney opened his case to the jury he read the indictment in full. A part thereof is as follows: '' * * * on or about the 7th, 8th and 9th days of December, 1943, in the County of Kings, [the defendant] wilfully, feloniously and of malice aforethought poisoned Harriet Feldman, by giving and administering, and by causing to be given and administered, to her a quantity of poison, to wit, strychnine, and as a result of said poisoning the said Harriet Feldman died on December 9, 1943.''

The assistant district attorney, continuing his opening statement, was interrupted when he was about to state the events occurring on December 7th but the court ruled that it would allow him to make a statement '' regarding anything you expect to prove.'' The assistant district attorney then stated the events which occurred on December 7th during the evening when Mrs. Feldman was first seized with a convulsion and the events which transpired thereafter up to the time of her death. Among other things he said: '' We will show you, and it will be admitted by these doctors, that at that time *and while they were treating her in the hospital* they did not know what she was suffering from; *they didn't know that she had been poisoned,* as we will prove later she was; they didn't know that and they treated her for what they believed to be a condition superimposed by her pregnancy, the girl having been seven months pregnant at the time.'' (Emphasis supplied.)

At the end of the People's case, after the jury had been excluded, counsel moved to dismiss and asked the court '' if your Honor denies my motion to dismiss, I would like to have your Honor advise the jury, before the defense starts, that there is no scintilla of evidence supporting any claim that this defendant did administer or cause to be administered poison to his wife on December 7th, and that they must remove from their minds any suspicion that he is responsible for the condition his

wife was found in at the hour and the date mentioned." That, again, was not in the presence of the jury.

The court said: " With respect to your first request, that I instruct the jury that they are to disregard the date of December 7th and December 8th, I tell you now, * * * if and when it becomes necessary to charge the jury with respect to the law applicable to the facts in this case, the Court will leave for the consideration of this jury only the occurrence at 2:30 o'clock in the morning at the hospital."

On the next page we find: Counsel for defendant: " Now, I was going to say to your Honor on this matter of instructing the jury at this time as to the date of December 7th is because the indictment recites three days in which this defendant committed felonious, murderous acts, and I think the State having failed to sustain the allegation as to the 7th of December, that at this time it would be proper to instruct the jury on the question of December 7th.

" The Court: I do not agree with you on that proposition * * * . I believe that the jury, being properly instructed as I have already outlined, will eminently fairly and fully meet with your views and that the jury will be properly instructed in respect to the facts that they must find, as I have already suggested. That request is denied and your motion is accordingly denied."

Counsel for defendant excepted.

Again at the close of the entire case and again *not in the presence of the jury,* defendant's counsel moved: " I now ask the Court, at the close of both sides, to instruct the jury that the pleading in the indictment that charges that on or about the *7th* and *8th* and *9th* days of December 1943, in the County of Kings, that the defendant wilfully, feloniously and of malice aforethought poisoned Harriet Feldman by giving and administering and by causing to be given and administered to her a quantity of poisons, to wit, strychnine and as a result of said poisoning said Harriet Feldman died on December 9, 1943. In view of the failure of proof on the State's case to offer any scintilla of evidence to sustain the allegation in the indictment *touching December 7th,* I ask your Honor now to rule that date from the consideration of the jury." (Emphasis supplied.) The court said it would submit as to one date only, December 9, 1943. The court also

said " The jury will be instructed, in other words, to disregard and eliminate from their consideration any reference to the dates of December 7th and December 8th." Decision was reserved, however, until the following morning. When court then reconvened, the court said to counsel *in the absence of the jury,* " * * * yesterday you addressed yourself to the Court with respect to a direction to the jury that they disregard in their consideration the dates of December seventh and eighth. After due consideration, in view of the statement I made yesterday, specifically, that I shall instruct the jury to confine their consideration of the evidence in this case as applying only to the date of December 9, 1943, that portion of your motion in regard to which only the Court reserved decision is accordingly denied." Exception to that denial was duly recorded.

We have mentioned these matters at length to indicate that there was no question as to what the point involved was. The jury heard none of these discussions and did not know the position of the assistant district attorney, which I have quoted. It will be remembered that in his opening, the assistant district attorney read the indictment with all three dates in it to the jury.

Shortly after its commencement of its charge the court read the indictment to the jury, reading to them the allegation that the defendant did the acts complained of on the 7th, 8th and 9th days of December.

In the second next paragraph after that, the court told the jury that if the defendant did not cause the death on December 9th by giving and administering and causing to be given and administered strychnine at the Beth El Hospital, he must be acquitted. Then the next paragraph reads: " You will take into consideration all of the facts in this case, and if you come to the conclusion that the defendant did not bring about the death of Harriet Feldman, by giving or causing to be given or administered the strychnine poison, *as alleged in the indictment,* that ends the case." (Emphasis supplied.)

The court had just read the indictment which charged the acts on the 7th, 8th and 9th. In passing we may note that the court used the phrase " as alleged in the indictment " or its equivalent at three other places during his charge.

The nearest approach to telling the jury that it was not contended by the District Attorney that the defendant had anything to do with the administration of strychnine on December 7th is as follows:

" It is the People's contention in this case that Harriet Feldman came to her death through the administration of strychnine poison, and it is the burden of the prosecution to establish beyond a reasonable doubt and to your satisfaction that such strychnine poison was administered or caused to be administered through the criminal agency of the defendant. [No mention of time or place.] It is the contention of the defense that the strychnine poison which caused the death of Harriet Feldman was or could have been administered prior to her arrival at the hospital. This issue has been contested by the parties to this action. It is for you to determine whether the cause of death of Harriet Feldman was strychnine poison administered at the Beth El Hospital on December 9, 1943, at 2:30 a.m. contained in a bottle of medicine delivered by the defendant and that the defendant caused the death.

" I charge you that, in order to convict the defendant, you must be satisfied beyond a reasonable doubt that the strychnine poison from which Harriet Feldman died was administered to her at the Beth El Hospital at 2:30 a.m. on December 9, 1943, and that it was contained in a bottle delivered there by the defendant. If you entertain a reasonable doubt as to that, you must acquit the defendant."

That did not tell the jury that the defendant was not charged with responsibility for the ingestion of strychnine on December 7th, and all the experts on both sides had told the jury that Mrs. Feldman had ingested strychnine on that day.

In an endeavor to make that clear, defendant's counsel, at the conclusion of the charge, made the following requests (he made only two requests): " Mr. Murray: Now, your Honor, I have a request to charge on December 7th. Now, I ask your Honor to charge this jury that there is absolutely no evidence that this defendant administered strychnine to the deceased on the night of December 7th, or caused it to be administered, and that the jury must not consider the deceased's alleged condition on December 7th as any evidence of guilt on the part of the defendant, and in that respect may not even consider it.

" The Court: I decline to charge in the language employed by you, Mr. Murray; but I do charge you gentlemen, you are restricted in your consideration of the evidence in this case, as applying to the guilt or the non-guilt of this defendant, to concern yourselves only with the occurrence, the alleged occurrence of December 9, 1943. In other words, you are not concerned with what happened on December 7th or December 8th. What you must be satisfied with by the proof in this case and beyond a reasonable doubt is that the defendant on December 9, 1943, at 2:30 o'clock in the morning, that date and no other date, at the hospital and no other place, administered to or caused to be administered the strychnine poison. If you have any reasonable doubt that the People have proved beyond a reasonable doubt that this defendant is guilty of having committed this crime at the Beth El Hospital on December 9, 1943, I charge you now you will acquit him.

" Mr. Murray: Your Honor, I respectfully except to your Honor's refusal to charge in the terms requested.

" I have no further requests or exceptions.

" The Court: You have an exception."

That charge did not present the point to the jury upon which the court, the assistant district attorney and the counsel for the defendant had agreed in the absence of the jury, namely, that it was not contended that the defendant had anything to do with or was responsible in any way for the ingestion of strychnine by his wife on December 7th. It seems to us that it devaluated the testimony of the defendant's own experts. They were testifying for the defendant that the strychnine ingested on December 7th could have caused Mrs. Feldman's death on the 9th. They were doing that because, if the jury believed that her death was caused by the ingestion on the 7th, since the assistant district attorney made no contention that the defendant had anything to do with that, the defendant was entitled to an acquittal. When the assistant district attorney and the court did not make that clear *to the jury* but continued reading from the indictment to the jury that the defendant was charged with the administration of the poison on the 7th of December, the defendant's own experts may have contributed by their testimony to his conviction. We think the defendant was entitled to have it made clear that as far as his guilt was con-

cerned, his wife's condition on December 7th was not to be considered as any evidence of guilt and that it was not claimed that he administered strychnine to her on the 7th. That request, which we have quoted, was declined in the language requested and other words were substituted which did not say it and did not make it clear.

This case could have been tried by beginning the proof at the point where Mrs. Feldman recovered from the convulsion from which she suffered at 9:00 o'clock on December 8th and her subsequent improvement on that day. That might have caused the defendant as a matter of trial procedure to go forward with evidence as to the events of December 7th or to leave them out of the case altogether. We think the case could also have been tried as it was tried if the court and the assistant district attorney made it clear that there was no claim that the defendant was responsible for the events of December 7th. This latter was one matter that the court and the assistant district attorney did not make clear to the jury. The events of December 7th and December 8th could have been used for history or background only if it was made clear that that was their only relevancy in the case and to do that, the court should have gone out of its way to make it clear.

We say that because, except as history and background, the events of December 7th had no bearing upon or relationship to the guilt of the accused. That is the position which the assistant district attorney took when not in the presence of the jury. The reason for admission into evidence of the events of December 7th was stated by the assistant district attorney to be: " I would like to state for the record, if the Court please, that this proof is offered for the purpose of showing the continuity of events. On the further ground that the hypothetical question to be put to the experts to be called by the People must of necessity include the alleged symptoms from which they will state that in their opinion the deceased died of strychnine poisoning.

" I will also frankly state to the Court that it is not the contention of the People that the alleged strychnine poisoning of which the deceased was stricken on December 7th, 1943, was administered by or through any means on behalf of the defendant * * *." The reasons given by the assistant district attorney were invalid ones. " Continuity of events " was no

reason for the admission of the evidence to which objection had been made. Events to be admissible must have a clear and connected relation to the guilt of the accused and the assistant district attorney in the portion of the second paragraph which we have just quoted stated in so many words that there was no claim by him that the events of December 7th had reference to the guilt of the defendant. In the second place, the events of December 7th were not necessary for the hypothetical question to the experts for the People because each said that what happened on December 7th had no relation to Mrs. Feldman's death. The People's experts were called for the purpose of proving that the events of December 7th had no bearing on the cause of death. It was to testify to that that the District Attorney engaged them. It was only the defendant's experts who said that the events of December 7th, which the assistant district attorney conceded had no bearing on the defendant's guilt, could have caused Mrs. Feldman's death.

Moreover, we think the judgment of conviction must be reversed because of the ruling of the court upon the right of the defendant to cross-examine the expert or opinion witnesses. When the toxicologist was being cross-examined, the following questions were asked of him:

" Q. Now, you said that you got part of your information or knowledge about toxicology from literature; is that right? A. That's right.

" Q. Did you ever read ' Textbook of Physiology ' by Howell? A. I've glanced at it."

The court, without more, then ruled that if counsel wished to refer to any textbook or literature he must show it to the witness and that if the witness agreed with it and adopted it, the witness might then be questioned about it. The court said, " * * * I shall not permit you to read from that book or any other book. If you wish to question this witness regarding any material, any writing, any dissertation or questions or statements contained in that book, you will first refer to the witness; let him read it and if the witness replies that he is in agreement with it or that he adopts that argument as his own, then I will allow you to make reference to it. Otherwise, not."

During the same discussion the court repeated the ruling as follows: " * * * you will first refer the book to this witness

and if the witness tells the Court that he is in agreement with that statement or that writing and adopts that argument as his own, you may then question him regarding such statement or such argument. Otherwise I shall exclude it.''

In this State when an expert witness has given opinion testimony and on cross-examination has testified that a book called to his attention is recognized by him as an authority upon the subject as to which he has given an opinion, he may be confronted with a passage from the book which conflicts with the opinion he has expressed. This is permitted for the purpose of discrediting or weakening his testimony. (*Egan* v. *Dry Dock, East Broadway & Battery R. R. Co.*, 12 App. Div. 556; *Hastings* v. *Chrysler Corp.*, 273 App. Div. 292.) In the *Egan* case (*supra*) it was said: '' * * * it has been the custom, in this State at least, to call the attention of an expert witness, upon cross-examination, to books upon the subject, and ask whether or not authors whom he admitted to be good authority had not expressed opinions different from that which was given by him upon the stand. The reference to books in such cases is not made for the purpose of making the statements in the books evidence before a jury, but solely for the purpose of ascertaining the weight to be given to the testimony of the witness.'' (P. 571.)

There is another matter to which we shall refer since there must be another trial. The People called as a witness one August Wilkoc a teacher in the Brooklyn College of Pharmacy. He had not been a witness on the first trial. He testified that three or four months after he had loaned the defendant a book on toxicology written by Underhill and Koppanyi, he read an article in a newspaper in which the defendant's name was mentioned. There was also mention in the article of the date of Mrs. Feldman's death. That recalled to him the fact that the defendant had visited him and asked the witness to loan him his notes so that the defendant might take the State Board examination to become a pharmacist in Florida. The witness loaned the defendant the book instead. A book was shown to Wilkoc which he said was an exact copy of the book he had loaned. That copy was then received in evidence over objection. The assistant district attorney read at length from the exhibit under the headings as to symptoms of strychnine poisoning, and from headings entitled: '' Fatal Dose '', '' Fatal Period '',

" Post Mortem Appearances " and " Treatment of Nux Vomica Poisoning."

Apparently the witness had communicated with the District Attorney subsequent to the first trial which occurred in February, 1946.

During his charge the Trial Judge said: " You may only consider on this point, if you find the defendant borrowed the book, whether he did so for the purpose of planning and acquiring knowledge with respect to strychnine poisoning, and you may consider that the borrowing of this book at the time it is alleged to have been given to the defendant, *if not too remote to the subsequent death of the defendant's wife by strychnine poisoning,* was such conduct or action on the part of the defendant which you may consider on the question of intent, preparation, premeditation *or motive to commit the offense* charged." (Emphasis supplied.)

A borrowing of the book by the defendant was not evidence of a motive for the commission of the crime by him. He was not a layman seeking a book on poisons. He was a duly licensed pharmacist who would not have been licensed unless he had studied toxicology. Moreover there is no proof that he did not borrow the book with the intention of taking an examination in Florida. Motive means the reason why a thing is done and a borrowing of the book by the defendant could not be found to be a reason why he may have killed his wife. Hence the quoted words of the charge were incorrect and must be taken to have unduly prejudiced the defendant with the jury, since the court had earlier told them that the presence or absence of motive was a potent or impelling circumstance which could " render important aid when, without it, the intent with which the alleged criminal act was committed would remain in doubt."

The quoted words of the charge were erroneous for another reason, viz.: The Judge left it to the jury to say whether a borrowing of the book by the defendant was " too remote to the subsequent death of the defendant's wife by strychnine poisoning ". Whether evidence is " too remote " — i.e., whether it is proximately relevant to some fact in issue — is a question for the court, though in essence that question is one of fact (see *People* v. *Nitzberg,* 287 N. Y. 183, 187). The fact of a borrowing of the book in question by the defendant was of merely slight,

remote or conjectural significance and accordingly was inadmissible. Hence that fact should have been excluded by the Trial Judge.

The judgment of conviction should be reversed and a new trial ordered.

DESMOND, J. (dissenting). This defendant has been convicted, by two juries, of murdering his wife, on circumstantial and opinion evidence as all secret poisoners must be, but on proof so strong as to leave no doubt of his guilt (see summary of the case in the two opinions on the former appeal — 296 N. Y. 127). Now there is to be another reversal and a third trial. Let us examine the alleged errors on which this second reversal is based:

1. *As to the alleged failure to make clear to the jury that defendant was not being tried in connection with the events of December 7th:* From the beginning of the trial to its end, the prosecution directed its efforts to establishing, and the defense to refuting, that defendant poisoned his wife on the early morning of December 9th, at Beth El Hospital, and at no other time or place. No juror of even minimal intelligence could follow the course of the trial and be left with any slightest idea that defendant was being tried for causing his wife's December 7th attack, or that the testimony as to the December 7th occurrences could make out defendant's guilt of the December 9th poisoning. The trial court read the indictment which alleged December 7th, 8th and 9th, as the dates of the murder, then he pointed out that the indictment was a mere accusation not evidence, then most carefully stated that the charge actually being tried was that defendant committed the murder on December 9th, at the hospital, and that, if " that fact has not been established beyond a reasonable doubt, then you must disregard all other evidence in the case and give the defendant the benefit of the doubt and acquit him." The story of what had happened on the 7th was, obviously, put into the record as a necessary background and base only, for the opinion testimony produced by both sides. If there were any dregs of doubt in any juror's mind as to this, they were later forthrightly removed by the excerpts from the charge and the ruling on a request to charge, both quoted in Judge CONWAY's opinion. The second of

those, delivered just a minute or two before the very end of the trial, told the jurors that they were " not concerned with what happened on December 7th or December 8th " and that for conviction they must be satisfied beyond a reasonable doubt " that the defendant on December 9, 1943, at 2 :30 o'clock in the morning, that date and no other date, at the hospital and no other place, administered to or caused to be administered the strychnine poison." And then, to nail that down and hammer it home, the court told the jurors: " If you have any reasonable doubt that the People have proved beyond a reasonable doubt that this defendant is guilty of having committed this crime at the Beth El Hospital on December 9, 1943, I charge you now you will acquit him." A plainer statement could not be devised, and the presumption in law and common sense is that the jury understood and followed it (*People* v. *Barnes*, 202 N. Y. 77, 88; *People* v. *Pacelli*, 251 N. Y. 66, 67). True, the Judge could have charged all of defendant's requests in their exact language, and could have elaborated on the simple thought expressed in the quotation above, but he did not have to use counsel's words or add them to his own (*People* v. *Hughes*, 137 N. Y. 29, 40). The County Judge's plain language gave defendant full protection against any possible misconception by the jury as to the precise issue before it. It should be remarked that this alleged error was really before us on the first appeal, and an excerpt from the charge on the first trial, much like the one quoted above, was set out with apparent approval in the majority opinion of this court, on that first appeal (see 296 N. Y., *supra,* at p. 134).

2. *As to the attempted cross-examination of the People's experts, by defendant, by use of textbooks:* Defendant's experienced trial counsel at no time complied with the settled rule governing the method by which, on such cross-examination, the opinions of experts may be tested through the use of the literature on the subject. Nor did defendant's counsel, at any time, have the books he wished to use marked for identification, or disclose to the trial court what those books were or what they said. In the absence of any showing as to what books counsel wanted to read from, or what he wanted to point to therein, how can we say that a substantial right of defendant was affected?

To save the point for the Court of Appeals, it was necessary for defendant to do more (see *People* v. *Rizzi,* 297 N. Y. 874), than merely tell the trial court that he had a number of unidentified writings on his counsel table. True, the trial court misstated the technical rule as to procedure in confronting experts with opposing authorities, but section 542 of the Code Criminal Procedure, commands us to give judgment on this appeal, without regard to exceptions " which do not affect the substantial rights of the parties." Again, we note that this same alleged error was made on the first trial, also, and was argued to us in defendant's brief on the first appeal, but not mentioned in this court's opinion for reversal.

3. *As to the testimony that defendant borrowed a book dealing with toxicology:* The probative effect of this showing was probably slight, and any prejudicial effect was likewise slight. But if the jury believed that, a few weeks or months before his wife's death from strychnine poisoning, defendant had gone to his former college professor to get detailed information about poisons, the jury could infer — adding it to the already overwhelming case against defendant — that this research was part of his preparations for murder.

Defendant has been fairly dealt with. I vote to affirm.

LOUGHRAN, Ch. J., DYE and BROMLEY, JJ., concur with CONWAY, J.; DESMOND, J., dissents in opinion in which LEWIS and FULD, JJ., concur.

Judgment of conviction reversed, etc.