*368 OPINION OF THE COURT
Robert F. Julian, J.
This is a proceeding to determine whether or not William A. (the patient) should be retained pursuant to Mental Hygiene Law § 9.27. Mohawk Valley Psychiatric Center (the hospital) is requesting an order of retention for a two-year period. The patient is opposed to retention and seeks an immediate release or an order for a lesser period of retention.
The patient has a significant criminal record. He carries the combined Axis I diagnosis of both schizophrenia and pedophilia. He is a level three sex offender. He also has a diagnosis of borderline intellectual functioning. He presently actively receives auditory hallucinations that direct him to kill, which he claims he is able to overcome. His chart demonstrates that he is a model patient and has work privileges, attends movies with staff and has not posed management problems.
He is treated by Dr. Melendez who testified on behalf of the hospital that the patient is a danger to himself and others because he is actively hallucinating and that there is a connection between his hallucinations and his past acts of sexual abuse of children.
In 1998 as a result of a battery of psychological tests he was found to be a high risk to reengage in pedophilic activity. The patient complains that because the test results are stale, this court cannot assume he is presently a risk for pedophilic activity. The patient also argues in the form of a Brandéis brief that psychological tests to determine future dangerousness are unreliable in any event. Both positions are unsupported by any properly adduced medical opinion.
The hospital made a prima facie showing by clear and convincing evidence that the patient has active hallucinations instructing him to kill, that he is a significant risk to repeat pedophilic acts if discharged, that there is a connection between his hallucinations and his pedophilic actions, and that his pedophilia is presently untreated. According to Dr. Melendez, the hospital has not provided any psychotherapy relating to the patient’s pedophilia, because his active hallucinations impede such therapy.
Upon the close of the hospital’s prima facie case, the burden of going forward shifted to the patient.
“Upon trial, once the party bearing the burden of proof establishes a prima facie case . . . the adver *369 sary has the burden of going forward, that is, offering evidence to contradict the prima facie case. See Matter of Philip M, 82 NY2d 238, 244, 604 NYS2d 40; Commissioner of Social Services v Philip De G, 59 NY2d 137, 140, 463 NYS2d 761; Farmers’ Loan & Trust Co. v Siefke, 144 NY 354, 359, 39 NE 358.” (Prince, Richardson on Evidence § 3-202, at 100 [Farrell 11th ed].)
It was a burden the patient did not meet.
Initially the patient denied any prior pedophilic acts (despite his prior convictions); later in his testimony he virtually stated that but for his present hospitalization he would engage in those acts.[1] Indeed after denying ever having had sex with children, he stated that he would not attempt to have sex with children in the future because “I’m not ever going to put myself in that position ever again,” thereby admitting he engaged in prior pedophilic acts. At no time did the patient utter any acknowledgment that pedophilia was wrong. Indeed he gave the clear impression that he regarded the diagnosis of pedophilia as merely a bureaucratic impediment to his discharge.
The court further received a physician’s report in the medical record which quoted the patient’s pronouncement that if he was discharged from the hospital, he would attempt to have sex with children.[2]
There are therefore several reasons for the court to conclude that this patient remains immediately dangerous to himself and *370 others. He continues to receive violent auditory command hallucinations. He fails to acknowledge his past history of pedophilia while concurrently admitting that history later in his testimony. He clearly lacks insight regarding his condition. (See, Matter of Luis A., 13 AD3d 441 [2004].)
He apparently remains an immediate future danger to others based on the earlier psychological testing and the Diagnostic and Statistical Manual of Mental Disorders (4th ed) (DSM IV). Pedophilia is a DSM IV diagnosis. According to the DSM IV (at 571 [2000]), “The frequency of pedophilic behavior often fluctuates with psychological stress. The course is usually chronic, especially in those attracted to males. The recidivism rate for individuals with pedophilia involving a preference for males is roughly twice that for those who prefer females.” (Emphasis added.) The patient is an obvious significant risk to others— primarily children. His pedophilia remains untreated and obviously requires therapy.
Prior to any future discharge the hospital has a duty to engage in treatment of his pedophilia and to provide a predischarge diagnosis based on that treatment opining that his pedophilia is sufficiently remediated so that he is not a risk to himself and others. At least to date the clinicians at the hospital do not feel he can be discharged and can only project discharge to a highly supervised setting. (See inpatient screening admission note psychiatric evaluation, Nov. 19, 2004.)
Since the court proposes to take judicial notice of the DSM IV for the purpose of its conclusions about his future dangerousness, the patient is entitled to a hearing on that matter and has seven days to demand the same. The basis of the judicial notice is that the DSM IV is a published scientific text which the court facially regards as propounding a “principle [which] is accepted as a valid one in the appropriate scientific community.” (2 McCormick, Evidence § 330, at 378 [5th ed]; People ex rel. Butler v McNeill, 30 Misc 2d 722 [Sup Ct, Dutchess County 1961].) The court regards said scientific report as a facially “safe and proper” opinion and authority, subject to any objection and/or impeachment by the patient. (Brown v Piper, 91 US 37, 42 [1875]; People v Cooper, 219 AD2d 426 [1st Dept 1996].)
Because no exact standard or mechanism exists in New York for the taking of judicial notice in a circumstance such as the case at bar, the court accepts and applies the following:
“The American Law Institute’s Code of Evidence sets up adequate safeguards: (a) by requiring that *371 the party requesting judicial notice furnish the judge sufficient information and give each adverse party notice necessary to enable him to meet the request; (b) by providing that the judge shall decline to take judicial notice of a matter unless it clearly is indisputable; (c) by directing the judge, where the fact would in the absence of judicial notice be determined by the trier of fact, to direct the jury to find the matter as judicially noticed, or, in a nonjury case, to include in the record of the trial a statement of the matter so noticed; (d) by making it mandatory that the judge inform the parties of the tenor of any matter to be judicially noticed by him and afford each of them reasonable opportunity to present to him information relevant to the propriety of taking such judicial notice or to the tenor of the matter to be noticed; and (e) by allowing both the trial judge in proceedings subsequent to trial and the reviewing court to take judicial notice, but requiring in such event that the parties be afforded reasonable opportunity to present information relevant to the propriety of taking such judicial notice and to the tenor of the matter to be noticed.” (Edmund M. Morgan, Judicial Notice, 57 Harv L Rev 269, 293 [1944].)
If a hearing is not requested, the petition is granted for a two-year retention order.
The patient, pursuant to law, is granted anonymous status, shall be referred to as William A., and the papers in this matter shall be so redacted.
Decision:
After this court proposed to take judicial notice of the DSM IV in the above proposed decision regarding the retention hearing in this matter, William A.’s (the respondent patient) counsel filed a memorandum of law contending it would be error to take judicial notice as proposed.[3] Specifically, the patient argues: (1) that the DSM IV is not an indisputable authoritative text; (2) that the court cannot take judicial notice of specific applications of the DSM IV; and (3) that using judicial notice as expert opinion is inadmissible hearsay.
*372 This court is required to take judicial notice of the common law, statutes, constitutions of the United States and every state, and the New York Codes, Rules and Regulations (CPLR 4511 [a]). As set forth below, the decision to take judicial notice of the DSM IV is accordingly mandated by law.
Several terms defined in the Mental Hygiene Law depend on definitions found in the “most recent edition” of the DSM IV (Mental Hygiene Law § 1.03 [52], [53], [54]). For example, Mental Hygiene Law § 1.03 (52) defines persons with serious mental illness as individuals with a “designated diagnosis of mental illness under the most recent edition of the [DSM IV].” A designated mental illness diagnosis is further defined as a DSM IV diagnosis (14 NYCRR 512.4, 587.4 [a] [5]). Therefore, by law, to determine if the patient has a mental disorder, the court must take judicial notice of and apply the DSM IV
There is some controversy over the DSM TV (see, Vaidya, M.D. and Taylor, M.D., The DSM: Should It Have A Future?, Psychiatric Times, Mar. 1, 2006, at 73; John E. Helzer, M.D., A DSM for the Future, Psychiatric Times, Mar. 1, 2006, at 79). Both of these articles, offered by the patient in support of his position, criticize the DSM IV’s shortcomings and offer no or few suggestions for an alternative procedure that can promote consistent research, diagnosis, or definitions of “mental disorders.” The patient is unable to provide any proof that the DSM IV is no longer the primary source that psychiatrists rely on to diagnose their patients’ mental disorders.
Many other courts refer to the DSM IV to not only understand a patient’s mental diagnosis but even to evaluate a statute’s constitutionality. In his concurring opinion, District Judge Wilson took judicial notice of the DSM IV to determine the defendant’s mental disorder and applied the DSM IV to the defendant’s symptoms (United States v Murdoch, 98 F3d 472, 479 [9th Cir 1996], citing United States v Cantu, 12 F3d 1506, 1509 n 1 [9th Cir 1993] and United States v Johnson, 979 F2d 396, 401 [6th Cir 1992]). Judge Wilson explained that in order to apply the law to the facts, he needed to refer to the DSM IV to understand the facts leading to the doctors’ diagnosis (Murdoch, 98 F3d at 479 n 5).
To determine the constitutionality of a statute, the Kansas trial court took judicial notice of the DSM IV (Matter of Vanderblomen, 264 Kan 676, 678, 679, 956 P2d 1320, 1322 [Sup Ct 1998]). In affirming the trial court decision, the Kansas Supreme Court also referred to the DSM IV in its analysis (id.).
*373 In United States v Johnson (979 F2d 396, 401 [6th Cir 1992]), the Sixth Circuit Court of Appeals took judicial notice of the DSM IV in use at that time as it analyzed whether the defendant was mentally incompetent to stand trial. Ultimately that court found the defendant competent to stand trial when it found that the defendant’s criminal behavior occurred long before the alleged “triggering event” that caused the alleged mental disorder.
In Fuller v J.P. Morgan Chase & Co. (423 F3d 104 [2d Cir 2005]), the court describes the DSM IV as an “objective authority” for diagnosing mental disorders (id. at 107). The plaintiff in Fuller sued because the defendant employer stopped providing disability payments. The plaintiffs disability was a result of a mental disorder; therefore, she was only provided 18 months of benefits, per the long-term disability plan (id. at 105, 106). The court concluded that the plan administrator reasonably used the DSM IV to determine the nature of the plaintiffs disability (id. at 106, 107).
As it is the role of the judge in a bench trial or hearing to apply the law to a specific set of facts, this court is fully within its authority to utilize the DSM IV in reference to this patient as a resource to assist in evaluating the testimony regarding the patient’s dangerousness. The remaining issue is whether the judicially noticed DSM IV is being used as expert opinion and whether that opinion is inadmissible hearsay. It is not. This court’s prior decision in this matter concluded that the patient is dangerous to others. It was based on the facts in this case, the medical opinions offered in open court, the medical records, and the DSM IV
Lipschitz v Stein (10 AD3d 634 [2d Dept 2004]), the authority cited by respondent, does not apply to the case at bar. In Lipschitz, the defendant’s expert referred to an opinion expressed in an “Endophthalmitis Vitrectomy Study” (id. at 636). That study was not in evidence and the defendant never established the study’s reliability {id.). At bar, the “authoritative” source in question is the statutorily accepted DSM IV The DSM IV did not provide any opinions about this specific patient; it is a guide for diagnosing mental disorders which petitioner’s expert physician has opined is applicable to this patient who he has diagnosed as having the mental disorder pedophilia.
In determining whether this patient is a danger to others (Rivers v Katz, 67 NY2d 485, 492 [1986]), the DSM IV therefore provides insight into the nature of the diagnosis he has been *374 given by the physician who testified on behalf of the petitioner. The DSM IV is not expressing an expert opinion that this individual patient is dangerous. This patient, as a matter of fact, is dangerous because he fails to acknowledge his prior hallucinations, denies his convictions for pedophilic behavior, still hears voices telling him to “kill people,” and later in his testimony admitted both his history of pedophilia and his inability to recognize that it is wrong. The DSM IV explains that pedophilic behavior is generally cyclical in nature and fluctuates with psychological stress and offers observations about pedophilic recidivism. This does not prove this patient’s dangerousness, nor is the DSM IV referenced to prove the same. Rather the DSM IV offers further general information about individuals with pedophilia that assists the court in reaching the conclusion that, based on the facts and expert opinions already offered, this patient is likely to repeat pedophilic behavior in the future (DSM IV at 571 [2000]). The patient had a full opportunity to cross-examine petitioner’s expert on the diagnosis and its relationship to DSM I\( and did not call an expert of his own on these issues.
Of course, the court’s determination that the patient poses an immediate danger to others is based on other evidence as well. For example, the patient repeatedly denied having any pedophilic impulses or behavior and at the same time feels that his behavior was normal while inadvertently admitting his prior (and previously denied) pedophilic acts. This court has also previously found that the patient does not appear to understand that his past behavior is wrong.
Finally, pursuant to its earlier decision, the court offered the respondent an evidentiary hearing on the entire issue of judicial notice which he declined.
Therefore, the petitioner’s application is granted and the respondent shall be involuntarily retained for two years with credit for time that has intervened from the date of the original application.

. Patient’s testimony at 50:
“Out in front where the smoke hut is a lot of kids go past there. I don’t touch them.
“Q. Do you want to at all?
“A. No, I don’t know. I’ve been there long enough. I just want out; that’s all I want.” (Emphasis added.)

. Progress note of Dr. Maria Melendez, June 1, 2005:
“The voices tell him to ‘go and kill people’, ‘to go to hell’, but denies hearing voices that tell him to sexually abuse children. His response to this question has never been consistent, but a few months ago, when interviewed to determine compliancy, he reported hearing that type of voices and that he felt he could repeat the abuse. He admits suffering from a mental illness and needs to take his medication, says he will continue when discharged. He denies responding to command hallucinations when crimes were perpetrated, but has responded yes to other interviewers. His insight into the sexual offense is poor. This was evident when he recently went to Court requesting his sexual offender status be reduced. When asked what would he do if he is in the community and sees a child, responded that he will not do anything, since ‘I’m not that hard up.’ ”

. In summary, the court proposed to take judicial notice of that part of the DSM IV which offered general opinions about the risk of repeated conduct by pedophiles and environmental factors which trigger pedophilic acts. A hearing on this proposal was offered and declined by the patient, but a brief was filed citing specific scientific articles, some of which are discussed below.